RENAISSANCE HEALTHCARE SYSTEMS, INC., Renaissance Hospital, Inc., and Houston Community Hospital, Inc. d/b/a Renaissance Hospital, Appellants,

v.

Dianne SWAN, individually and as Representative of the Estate of Jennifer Renee Abshire, and for and on behalf of any Wrongful Death Beneficiaries of Jennifer Renee Abshire, Jason Holst, Individually, and David "Andrew" Maxey, as next Friend of Trista Maxey, Appellees.

No. 09-10-00433-CV.

Court of Appeals of Texas, Beaumont.

Submitted March 3, 2011.

Decided June 30, 2011.

---

Gordon M. Carver, III, Heather M. Morlang, Watt Beckworth Thompson & Henneman, L.L.P., Houston, for appellants.

Brian D. Sutton, Joseph N. Jannise, Jr., Stephanie H. Harris, Sutton & Jacobs, L.L.P., Beaumont, for appellees.

Before McKEITHEN, C.J., KREGER and HORTON, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

This is an accelerated appeal from the trial court's order denying a motion to dismiss filed pursuant to section 74.351 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (West 2011); *see also id.* § 51.014(a)(9) (West 2008). We affirm the trial court's judgment.

## BACKGROUND

Dianne Swan, individually and as representative of the estate of Jennifer Renee Abshire, and for and on behalf of any wrongful death beneficiaries of Abshire; Jason Holst, individually; and David "Andrew" Maxey, as next friend of Trista Maxey, (collectively "appellees") brought a healthcare liability claim against Renaissance Healthcare Systems, Inc., Renaissance Hospital, Inc., and Houston Community Hospital, Inc. d/b/a Renaissance Hospital (collectively "appellants"), and other defendants.[1] According to appellees, Dr. John Q.A. Webb, who was treating Abshire for a herniated disc, referred Abshire to Dr. Merrimon Baker, an orthopedic surgeon. Appellees contend that Webb was "acting as an agent and/or employee of and/or on behalf of" one or more of the hospital defendants. Appellees assert that Baker performed a bilateral lumbar laminectomy and diskectomy on Abshire at Renaissance Hospital, and during the surgery, Baker transected Abshire's "right internal iliac artery, failed to recognize that he had done so, and thus failed to repair the artery prior to closing." Abshire suffered massive internal hemorrhaging, which led to cardiac arrest and her death.

Appellees asserted causes of action against appellants for malicious credentialing of Baker, negligence, and gross negligence. According to appellees' petition, because Webb was acting as the "agent, employee, member, officer[,] and/or director" of Beaumont Spine Pain & Sports Medicine Clinic, Inc. ("Beaumont Spine"), and appellants allegedly owned and operated Beaumont Spine, appellees' allegations of negligence against Webb also applied to appellants under the doctrine of *respondeat superior.* According to appellees, appellants failed to maintain an appropriate standard of care by permitting physicians whom appellants knew to be incompetent and unqualified to operate on Abshire.

Appellees also contended that, by permitting nurses and other staff members who lacked appropriate training and experience to care for Abshire, appellants failed to carefully evaluate and select competent nurses and other staff members, adequately train nurses and other staff members, adequately supervise the treatment provided by nurses and other staff members, and maintain an appropriate standard of care. In addition, appellees alleged that the various defendants were involved in a joint enterprise "for monetary profit via the delivery of medical services" to Abshire.

Appellees filed expert reports authored by Dr. Emilio B. Lobato and Dr. J. Michael Simpson. Appellants objected to the reports and filed motions to dismiss. *See* Tex. Civ. Prac. & Rem.Code Ann.

---

1. In an earlier appeal, we addressed the adequacy of the expert reports as to defendants Beaumont Spine & Sports Medicine Clinic, Inc., individually and d/b/a Beaumont Spine Pain & Sports Medicine, Beaumont Spine & Sports Medicine, Dr. John Q.A. Webb, John Q.A. Webb, Jr., M.D., P.A., individually and d/b/a Beaumont Medical Clinic, and Beaumont Medical Clinic. *Beaumont Spine Pain & Sports Medicine Clinic, Inc. v. Swan,* No. 09–10–00347–CV, 2011 WL 379168 (Tex. App.-Beaumont Feb. 3, 2011, pet. denied).

§ 74.351(*l*). Appellees filed a supplemental report by Lobato after appellants filed their objections. The trial court sustained appellants' objections and granted appellees a thirty-day extension to file additional reports. Appellees subsequently filed additional reports from Dr. Keith E. Miller and Arthur S. Shorr, FACHE,[2] as well as a supplemental report from Shorr. After appellants filed objections and motions to dismiss concerning the additional and supplemental reports, the trial court overruled appellants' objections and denied appellants' motions to dismiss. Appellants then filed this appeal, in which they present three issues for our review.

## THE EXPERT REPORTS

### Dr. Emilio B. Lobato

In his initial report, Lobato, who is board certified in anesthesiology and internal medicine, explained that Abshire was admitted to "Renaissance Hospital Houston" on August 11, 2006, to undergo a lumbar laminectomy and bilateral diskectomy of L5–S1. Lobato noted that during surgery, Abshire's blood pressure decreased to 80/50, and when Abshire was moved to the PACU (post-anesthesia care unit) after surgery, her blood pressure was 88/31, and her heart rate was 121. According to Lobato, "[t]he PACU record reveals a pattern of persistent hypotension since her admission with values as low as 50 mm Hg systolic. This was accompanied by extreme tachycardia eventually followed by terminal bradycardia." Lobato opined as follows:

> In my professional opinion, and with a great degree of medical certainty, Ms. Abshire suffered from severe hemorrhagic shock following a surgical transection caused by Dr. Baker of her right iliac artery which occurred during her lumbar laminectomy. Ms. Abshire continued to hemorrhage in the PACU causing hypovolemic shock which went inappropriately treated, thus, leading to her demise. In other words, Ms. Abshire's death was directly caused by Dr. Baker's trans[e]ction of the right internal iliac artery combined with the failure of Dr. Baker, Dr. McHargue [Abshire's anesthesiologist] and the PACU nursing staff to diagnose and [treat] the resulting hemorrhage and hypovolemic shock.

> Ms. Abshire's death was a direct result of the negligent actions of the surgeon …, the anesthesiologist … and the PACU nurses from Renaissance Hospital in Houston[,] Texas. The untimely diagnosed and untreated severe hemorrhage suffered by Ms. Abshire was a direct and proximate cause of her death. The lack of timely identification and appropriate treatment by the above care providers was directly responsible for her prolonged state of shock, leading to her untimely death.

According to Lobato, Abshire "was clearly manifesting enough signs of hypovolemic shock that a medical student should have diagnosed it." Lobato stated that Abshire exhibited symptoms of "a class IV hemorrhagic shock which is clinically associated with more than 40% blood loss[,]" and that a class IV hemorrhage is "immediately life threatening." Lobato explained that the symptoms of class IV hemorrhage include "marked tachycardia, decreased systolic blood pressure, narrowed pulse pressure (or immeasurable diastolic pressure), markedly decreased (or no) urinary output, depressed mental status (or loss of consciousness), and cold, pale skin."

Lobato opined that "the standard of care requires that both physicians and nursing

2. "FACHE" stands for "Fellow of the American College of Healthcare Executives."

personnel recognize the signs and symptoms of progressive and severe hemorrhage." Lobato stated that severe tachycardia without concomitant elevation of blood pressure, followed shortly by hypotension, pallor, and obtundation, are the classic signs of hypovolemic shock, and the injury must be timely recognized and treated in a timely fashion because failure to do so will result in a fatality. Lobato stated as follows:

> Ms. Abshire exhibited florid signs of hypovolemic shock including tachycardia, hypotension, pallor, decrease in mental status and progressive hypoxemia eventually culminating into pulseless electrical activity. The fact that Ms. Abshire displayed flagrant hemorrhagic shock without appropriate therapy in the eyes of anesthesiologists, orthopaedic surgeon, and post anesthesia care unit nurses, is beyond belief. All of these health care team members share responsibility for the eventual demise that Ms. Abshire suffered.

With respect to appellants in particular, Lobato explained that he understood from reviewing the original petition that "the Renaissance entities have common ownership, are all part of the same healthcare system, and/or are all involved in a joint enterprise for the provision of healthcare to patients such as Ms. Abshire." Lobato stated, "Therefore, my criticisms of the nursing staff of Renaissance Hospital— Houston are directed to the remaining Renaissance entities as well since they all have related or common ownership and/or are all involved in a joint enterprise." Lobato opined that the standard of care "requires that a qualified PACU nurse recognize signs and symptoms of hypovolemia such as tachycardia and progressive hypotension (assessment and nursing diagnosis)." Lobato explained that PACU nurses should also know that treating hypovolemia requires "aggressive fluid re-

suscitation and frequent evaluation of the response to treatment[.]" In addition, Lobato opined as follows:

> The standard of care also demands that the nursing staff inform the surgeon and the anesthesiologist of severe hypotension particularly if it is recurring and demand their presence to personally assess. A qualified PACU nurse also has the obligation to act as the patient's advocate. In the presence of a clinically unstable patient[,][a] PACU nurse should have insisted that either Dr. Baker or Dr. McHargue come to and remain at the bedside. In addition, should the anesthesiologist or neurosurgeon fail to institute the right treatment[,] ... the nurse has not only the right but the obligation to rapidly institute the chain of command. This requires the involvement of a qualified supervisor and involves the summoning of another qualified anesthesiologist and surgeon to provide the appropriate care of the patient.

> PACU Nurses at the Hospital caring for Ms. Abshire were obligated to work on the patient's behalf, not the physician's. In this case, the blatant neglect by Dr. Baker and the mismanagement by Dr. McHargue made the PACU nurses the last resort to prevent her death. Instead of behaving as patients' advocates, PACU Nurses limited themselves to record the progression of Ms. Abshire's hemorrhage towards her inexorable death and to uncritically institute what was clearly suboptimal and incomplete therapy.

Lobato explained that the PACU nurses failed to recognize severe and progressive hypovolemia, failed to demand more aggressive fluid resuscitation, failed to demand that a physician be continuously present at Abshire's bedside, and failed "to

institute the chain of command to provide a qualified medical provider to institute the right therapy in a timely fashion. . . ." According to Lobato, if the PACU nursing staff had taken appropriate measures, "more likely than not, at least one physician caring for Ms. Abshire would have realized that they were dealing with a hemorrhage, . . . and once that connection had been made, Ms. Abshire more likely than not would have been appropriately treated and her life saved." Lobato stated that the failure of Baker, McHargue, and the PACU nursing staff to follow the standards of care "resulted in the irreversible shock suffered by Ms. Jennifer Abshire and ultimately her death. Thus, their actions were[,] in reasonable medical probability[,] the proximate cause of Ms. Abshire's death. Had the standard of care been observed . . ., it is my opinion that her untimely death would have been prevented."

In his supplemental report, Lobato stated as follows:

I am not suggesting . . . that nurses should be "practicing medicine" or prescribing treatments, but rather, that they should be performing adequate nursing assessments and nursing diagnoses that they are not only qualified to make but are obligated to make. In this instance, it is the duty of a PACU nurse to recognize signs and symptoms of hypovolemia because of the likelihood that hypovolemia in a post-surgical patient indicates hemorrhage, and because of the possible fatal consequences of such a hemorrhage. This clearly falls within the category of "nursing diagnoses" and "nursing assessments."

Lobato further noted a nurse should pay close attention to a patient's physical appearance, and Lobato explained that "the autopsy report notes that upon *external* examination, Ms. Abshire's skin color was 'strikingly pale' and that her abdomen was protuberant." Lobato stated that upon reviewing the autopsy photographs of Abshire's abdomen, he noted that Abshire's abdomen

is so protuberant as to resemble that of a woman in late pregnancy. This distension is visible to the naked eye, even through her hospital gown, and would have been visible to the PACU nurses and anyone else who happened to glance in the area of her abdomen. Her abdomen would not have suddenly swelled to that size in the moments before her death; rather, the abdomen protruded because it was filling with the 4680 milliliters of blood hemorrhaged from the severed artery. The expansion of the belly would have occurred during the entire course of Ms. Abshire's time in the PACU, and as it expanded, provided easily accessible evidence that there was a problem in the area where the surgery was performed. The expanding abdomen, when coupled with the clinical picture of the falling blood pressures, should have alerted the nurses of the strong possibility of hemorrhage."

Lobato also explained in his supplemental report that a hospital must "properly train its PACU nursing staff to recognize hypovolemia in post-surgical patients, to know its potential causes, and to act quickly and decisively in the face of such signs and symptoms. . . ." Lobato also stated as follows:

Again, by this I do not mean that the Hospital should have trained its staff to make medical diagnoses or prescribe treatment, but rather to train them to be aware of the signs and symptoms of major and potentially lethal post-operative complications. . . . If the Hospital in this case had conducted any such training, it was clearly ineffective, as the PACU nurses caring for Ms. Abshire

exhibited no signs of recognizing what was happening to Ms. Abshire, nor did they take any of the required actions ... which would have led to a diagnosis of the hemorrhage and hypovolemia in time to treat it and save Ms. Abshire's life.

Lobato explained that if the nurses had recognized Abshire's hypovolemic shock and demanded "the immediate presence of the operating surgeon at the bedside for an immediate consultation with a general or vascular surgeon while read[y]ing an operating room for an emergency exploratory laparotomy," a surgeon would have recognized that Abshire was suffering from an acute intra-abdominal hemorrhage and "taken Ms. Abshire to the operating room immediately in order to identify the bleeding, clamp and repair the lacerated vessel, thus effectively stopping the hemorrhage." Lobato opined that although Abshire would have required significant blood transfusions, as well as post-operative care in the intensive care unit, "had she been returned to the operating room shortly after her arrival to the PACU, it is very likely (in other words, more likely than not) that she would have survived."

### Dr. J. Michael Simpson

Simpson explained that he is a board-certified orthopedic surgeon, and he has served in hospital administration, including his present position as medical director of St. Mary's Spine Center. Simpson stated that, as a result of his experience as a practicing orthopedic surgeon and in hospital administration, he has "knowledge of the standards of care applicable to the credentialing of physicians, and in particular surgeons, to practice in hospitals[,]" as well as the standards of care applicable to a physician who is referring a patient to another physician. Simpson explained that Webb's records do not indicate how Webb arranged Abshire's referral to Bak-

er or whether Webb investigated Baker's competence prior to making the referral. Simpson stated, "[A]ccording to public documents attached to Plaintiff's Original Petition, which I have reviewed, by the time Dr. Webb referred Ms. Abshire to Dr. Baker, Dr. Baker had a well-known public history, both in the medical community and in the community at large, for incompetence and drug use."

Simpson explained that two appellate court opinions, both of which were published before Webb referred Abshire to Baker, set forth Baker's history, and that Simpson had served as an expert witness in one of the cases. According to Simpson, one of the appellate opinions involved a patient who suffered an injury that was quite similar to Abshire's injury. Simpson also noted that at the time of the referral, the Texas Board of Medical Examiners ("TBME") had filed several complaints against Baker. Simpson stated that information contained in the TBME complaints was publicly accessible.

According to Simpson, the standard of care required Webb to "have a basic knowledge of the skills and professional reputation of the physician to whom the patient is being referred." Simpson explained that the standard of care also required a referring physician to "refrain from referring a patient to a physician with a well-documented history of drug use, malpractice, and repeated complaints by the board of medical examiners." Simpson opined that Webb's referral of Abshire to Baker

was the direct cause of Dr. Baker's performing surgery on Ms. Abshire, absent which, Dr. Baker would not have been the surgeon operating on Ms. Abshire. In all reasonable medical probability, had Dr. Baker, a physician with a well-known reputation for surgical incompetence, not been Ms. Abshire's sur-

geon, her right internal iliac artery would not have been transected and the transaction left undiscovered to cause exsanguination and death.

Simpson also stated that based upon the documents he had reviewed, Webb's employer, Beaumont Spine Pain & Sports Medicine Clinic, Inc. was owned and operated by the various Renaissance Hospital entities, "thus making Dr. Webb an employee" of the Renaissance entities. Accordingly, Simpson explicitly incorporated by reference his criticisms of Webb as to the Renaissance entities. Simpson also explained that his "criticisms of the nursing staff and hospital administration responsible for credentialing Dr. Baker at Renaissance Hospital—Houston, are directed to the remaining Renaissance entities as well since they all have related or common ownership and/or are all involved in a joint enterprise."

According to Simpson, Renaissance Hospital had a duty to follow JCAH (Joint Commission on Accreditation of Hospitals)[3] standards in credentialing physicians, and JCAH standards required Baker to disclose his record of malpractice records and settlements. Simpson also noted that because the appellate opinions and the state board complaints were publicly accessible, "a reasonably prudent credentialing committee should have limited, denied[,] or revoked Dr. Baker's privileges." Simpson stated that Renaissance Hospital failed to follow the proper credentialing process because Baker's malpractice history "would have been well known in medical and hospital administration circles in the Houston area. Had the Hospital done even a bare minimum of investigation of Dr. Baker's malpractice history, it should have never granted privileges to Dr. Baker." According to Simpson, appellants could have decided to deny or revoke Baker's credentials

based solely on information that was in the public domain at the time, or at the very least, the sheer volume of this information available to the public, and well-known throughout the medical community, should have alerted the Hospital to do a thorough investigation of Dr. Baker and his malpractice history and state board status, which surely would have resulted in any reasonable credentialing committee's denying such privileges.

Simpson opined that if the hospital had denied or revoked Baker's surgical credentials, in all reasonable medical probability, a competent surgeon would have operated on Abshire, Abshire's artery would not have been severed, and Abshire would not have bled to death.

Simpson further explained that the standard of care requires PACU nurses to recognize signs and symptoms of hypovolemia as part of assessment and nursing diagnosis, to insist upon rapid intravenous administration of fluids, and to inform the surgeon and anesthesiologist of severe hypotension, "particularly if it is recurring and demand their presence to personally assess." Simpson explained as follows:

A qualified PACU nurse also has the obligation to act as the patient's advocate. In the presence of a clinically unstable patient[,] [a] PACU nurse should have insisted that either Dr. Baker or Dr. McHargue come to and remain at the bedside. In addition, should the anesthesiologist or neurosurgeon fail to institute the right treatment ... the nurse has not only the right but the obligation to rapidly institute the chain of command. This requires the

---

**3.** *See Mitchell v. Amarillo Hosp. Dist.,* 855 S.W.2d 857, 867 (Tex.App.-Amarillo 1993, writ denied) (discussing the meaning of the acronym "JCAH").

involvement of a qualified supervisor and involves the summoning of another qualified anesthesiologist and surgeon to provide the appropriate care of the patient.

Simpson opined that the hospital's nurses breached the standard of care by failing to (1) recognize severe and progressive hypovolemia, (2) demand more aggressive fluid resuscitation, (3) demand that a physician be continuously present at Abshire's bedside, and (4) institute the chain of command so that a qualified medical provider could have timely instituted the proper treatment. According to Simpson, if the PACU nurses had undertaken appropriate measures, "more likely than not, at least one physician caring for Ms. Abshire would have realized that they were dealing with a hemorrhage, ... and once that connection had been made, Ms. Abshire more likely than not would have been appropriately treated and her life saved."

### Dr. Keith E. Miller

Miller, a family physician with experience serving on hospital committees, explained that he is familiar with the standards of care applicable to physicians, nurses, hospitals, and emergency departments that treat patients such as Abshire. In addition, Miller explained that he had previously served as a commissioner of the Texas Medical Board. Miller stated as follows:

> According to public documents, information available to the public on the Texas Medical Board website, and in a newsletter published by the Texas Medical Board which is mailed to every physician in Texas, including Dr. Webb, Dr. Baker had a well-known public history, both in the medical community and in the community at large, for incompetence and drug use at the time Dr. Webb made the referral of Ms. Abshire.

Miller noted that when Webb referred Abshire to Baker, Baker was defending several complaints filed by the Texas Medical Board. In addition, Miller stated that Baker "had also been the subject of a rather notorious court case[,] during which it was reported that Dr. Baker had ... drug problems, mental health problems[,] and erratic behavior, and ... he had lost privileges at two hospitals."

According to Miller, the standard of care required Webb to use "reasonable medical judgment and effort in determining the need for a referral and in selecting a competent physician to which [Abshire] could appropriately be referred." Miller stated that all physicians in Texas receive the Texas Medical Board newsletter and are expected to be familiar with its contents, including information about disciplinary actions taken by the board against physicians. Miller also indicated that the standard of care required that Webb should not have referred Abshire to Baker "for medical care due to his well-known history of drug use, erratic behavior[,] and most of all, his history of serious adverse patient outcomes."

Miller explained that Webb breached the standard of care by referring Abshire to Baker. Miller stated that "[a] reasonable physician practicing according to acceptable standards of medical care would have used reasonable efforts to ascertain the qualifications of physicians to which they refer patients...." Miller opined that "[h]ad proper care ... been given to Ms. Abshire[,] then more likely than not and to a reasonable degree of medical certainty and probability, Ms. Abshire would not have undergone surgery by Dr. Merrimon Baker, would not have had her iliac artery mistakenly and negligently severed during surgery, and would not have died." Like Lobato and Simpson, Miller stated that because he understood that appellants

owned Beaumont Spine, where Webb practiced medicine, Miller incorporated his criticisms of Webb as to appellants.

### Arthur S. Shorr, FACHE

Shorr stated that he is board certified in hospital and healthcare administration, and is a Fellow of the American College of Healthcare Executives. Shorr also stated that he has worked in senior executive management at acute care hospitals for sixteen years, and he is also president of Arthur S. Shorr & Associates, Inc., a management consulting firm that provides consulting services to hospitals and physicians. Shorr explained that his background, training, and experience make him "an expert in the administrative community standards applicable to all acute care hospitals in the United States, including Renaissance Hospital in Houston."

Shorr explained that the administrative community standards for hospitals in Texas are promulgated by the Center for Medicare & Medicaid Services (CMS), the Texas Department of Health, The Joint Commission, and the American Osteopathic Association (AOA), and he explained that the Joint Commission and AOA standards applied to Renaissance Hospital. According to Shorr, "It is the fiduciary responsibility of the hospital's governing body and chief executive officer ... to ensure that all applicable administrative community standards are met."

Shorr stated that the Joint Commission standards for hospital accreditation provide that when granting, renewing, or revising clinical privileges, the relevant criteria "include evidence of current competence[,]" as well as "peer recommendations when required." Shorr quoted as follows from the Joint Commission 2006 Hospital Accreditation Standards:

Before granting privileges, the organized medical staff evaluates the following: Challenges to any licensure or registration; Voluntary and involuntary relinquishment of any license or registration; Voluntary and involuntary termination of medical staff membership; Voluntary and involuntary limitation, reduction, or loss of clinical privileges; Any evidence of an unusual pattern or an excessive number of professional liability actions resulting in a final judgment against the applicant; Documentation as to the applicant's health status; Relevant practitioner-specific data are compared to aggregate data, when available; Morbidity and mortality data, when available.

Each reappraisal includes information concerning professional performance, including clinical and technical skills and information from hospital performance improvement activities, when such data are available.

. . .

The applicant's ability to perform privileges requested must be evaluated. This evaluation is documented in the individual's credentials file. . . .

At the time of renewal of privileges, the organized medical staff evaluates individuals for their continued ability to provide quality care, treatment, and services for the privileges requested as defined in the medical staff bylaws.

. . .

The process for renewal of privileges involves the same steps ... and additionally requires the medical staff to evaluate a practitioner's ability to perform the privileges requested based upon his or her performance during the period of time he or she has been practicing at the organization. . . . Current competence is determined by the results of performance improvement activities and peer recommendations.

Evidence of current ability to perform privileges requested is required of all applicants for renewal of clinical privileges. . . . The process should identify quality of care, treatment and services issues for groups of individuals as well as individual practitioners.

Shorr further explained that hospital licensing regulations contained in the Texas Administrative Code require a hospital to have a governing body that is responsible for appointing medical staff, among other things. The governing body must "[d]etermine, in accordance with state law and with the advice of the medical staff, which categories of practitioners are eligible candidates for appointment to the medical staff; . . . [e]nsure that criteria for selection include individual character, competence, training, experience, and judgment"; and "[e]nsure that the medical staff is accountable to the governing body for the quality of care provided to patients[.]"

According to Shorr, the federal regulations applicable to Medicare/Medicaid facilities require that the hospital must have an effective governing body to determine which categories of practitioners are eligible candidates for appointment to the medical staff; appoint members of the medical staff "after considering the recommendations of the existing members of the medical staff"; "[e]nsure that the medical staff is accountable to the governing body for the quality of care provided to patients"; and "[e]nsure [that] the criteria for selection are individual character, competence, training, experience, and judgment[.]" Shorr also explained that the hospital's medical staff "must periodically conduct appraisals of its members" and "examine credentials of candidates for medical staff membership and make recommendations to the governing body on the appointment of the candidates." The medical staff must also "be well organized and accounta-

ble to the governing body for the quality of the medical care provided to patients."

Shorr opined that Renaissance Hospital–Houston breached the administrative community standards as follows:

The governing body and chief executive officer failed to carry out their fiduciary duties to the community by maliciously and negligently granting orthopedic surgery privileges to Dr. Baker, in light of his "well-documented history of malpractice and professional incompetence in performing similar procedures in recent years[,]" "well-documented history of drug addiction and mental problems[,]" and "history of loss of privileges at other hospitals."

According to Shorr, a prudent governing body and chief executive officer, "acting reasonably, would conclude based upon Dr. Baker's history that granting orthopedic surgery privileges to Dr. Baker would put the hospital's patients in harm's way, and would act to protect the hospital's patients by denying such privileges[,]" and Renaissance Hospital—Houston's failure "to prevent Dr. Baker from obtaining or maintaining orthopedic surgery privileges at Renaissance Hospital—Houston is evidence of its malicious acts."

In his supplemental report, Shorr stated that Baker's "checkered history" included being the subject of two well-publicized judicial opinions, in which it was noted that Baker was addicted to Vicodin, exhibited mood swings, and had a "significant malpractice history, including two wrong-limb surgeries and a retained sponge surgery." Shorr also noted that as of August 16, 2005, the state medical board had filed complaints concerning Baker's care of six patients. Shorr indicated that he had reviewed materials from the board of medical examiners concerning each of the six patients, and he opined that in all of the cases, "Dr. Baker's actions or omissions

fell below the standard of care." Shorr stated that the medical board documents indicate that Baker had a continuing pattern of poor surgical outcomes and numerous surgical and post-operative complications. Shorr explained as follows: "It is my understanding that at the time Dr. Webb referred Ms. Abshire to Dr. Baker in 2006, all of the above information, including the judicial opinions and more importantly the information from the medical board, were all available to the public and were easily accessible through the internet." Shorr opined that

> the Hospital negligently and maliciously breached the administrative community standards ... by credentialing Dr. Baker in the face of his well-documented history of malpractice and professional incompetence in performing similar procedures in recent years; his well-documented history of drug addiction and mental problems; and his well-documented history of loss of privileges at other hospitals.

Shorr explained that typical procedures used by hospitals to comply with the applicable standards for credentialing physicians include requiring an applicant for privileges to complete an extensive application that requests information concerning the applicant's malpractice history, whether the applicant has had privileges at other hospitals denied or suspended, and peer recommendations; verifying the information on the application by checking peer recommendations, reviewing licenses in other states, and contacting such agencies as the state board of medical examiners, state law enforcement agencies, and the drug enforcement agency; and consulting the National Practitioner Database. Shorr opined that if appellants had employed such procedures, they would have discovered Baker's extensive malpractice history and the fact that other institutions

had taken adverse actions against his privileges.

According to Shorr, appellants

either failed to engage in a proper credentialing process in granting and/or renewing Dr. Baker's privileges, or chose to ignore the information gathered in such a process because a prudent governing body and chief executive officer, acting reasonably, would conclude, based on Dr. Baker's history, that granting orthopedic surgery privileges to Dr. Baker would put the hospital's patients in harm[']s way, and would act to protect the hospital's patients by denying such privileges. The failure of the governing body and chief executive officer to prevent Dr. Baker from obtaining or maintaining orthopedic surgery privileges at the Hospital is evidence of it[s] grossly negligent and malicious acts in that the Hospital either failed to follow any credentialing procedure at all, or if it did do any investigation, it knew of the extreme degree of risk Dr. Baker posed to its patients and credentialed him anyway. Either way, the Hospital's conduct involved an extreme degree of risk, considering the magnitude of potential harm of which the Hospital knew but nonetheless proceeded with conscious indifference to the safety and welfare of its patients.

In other words, the Hospital breached numerous specified administrative community standards, and thus, the standard of care, in granting Dr. Baker privileges to practice medicine and orthopedic surgery at its facility.

Finally, Shorr explained that because he understood that the Renaissance entities have common ownership, are part of the same healthcare system, or are "involved in a joint enterprise for the provision of healthcare to patients such as Ms. Abshire[,]" his "criticisms of the Hospital ad-

ministration responsible for credentialing Dr. Baker at Renaissance Hospital—Houston, are directed to the remaining Renaissance entities as well since they all have related or common ownership and/or are all involved in a joint enterprise."

## STANDARD OF REVIEW AND PERTINENT LAW

We review a trial court's decision regarding the adequacy of an expert report under an abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002). A trial court also abuses its discretion if it fails to analyze or apply the law correctly. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

A healthcare liability claimant must provide each defendant physician and healthcare provider with an expert report no later than the 120th day after the date of the filing of the original petition. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). The statute defines "expert report" as

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). If a plaintiff furnishes the required report within the time permitted, the defendant may file a motion challenging the adequacy of the report. *Id.* § 74.351(*l*). Section 74.351(i) provides

that a claimant may satisfy the requirements of section 74.351

> by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation. Nothing in this section shall be construed to mean that a single expert must address all liability and causation issues with respect to all physicians or health care providers or with respect to both liability and causation issues for a physician or health care provider.

*Id.* § 74.351(i).

The statute provides that the trial court "shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." *Id.* § 74.351(*l*). When determining whether the report represents a good-faith effort, the trial court's inquiry is limited to the four corners of the report. *Wright,* 79 S.W.3d at 53; *Palacios,* 46 S.W.3d at 878. To constitute a good-faith effort, the report "must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios,* 46 S.W.3d at 875. The expert report must set forth the applicable standard of care, how the standard was breached, and explain the causal relationship between the defendant's acts and the injury. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a), (r)(6); *Doades v. Syed,* 94 S.W.3d 664, 671–72 (Tex.App.-San Antonio 2002, no pet.); *Rittmer v. Garza,* 65 S.W.3d 718, 722–23 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

When a plaintiff sues more than one defendant, the expert report or reports must set forth the standard of care applicable to each defendant and explain the causal relationship between each defendant's individual acts and the injury. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a), (r)(6). An expert report need not marshal all of the plaintiff's proof; however, a report that omits any of the elements required by the statute does not constitute a good-faith effort. *Palacios*, 46 S.W.3d at 878–79. An expert "must explain the basis of his statements to link his conclusions to the facts." *Wright*, 79 S.W.3d at 52.

## THE ISSUES

In three issues, appellants assert that the trial court abused its discretion by overruling their objections, denying their motions to dismiss, and failing to sign an order awarding them their reasonable attorney's fees and court costs because appellees' expert reports do not constitute an objective, good-faith effort to comply with the requirements of section 74.351(r)(6) and *Palacios*.[4] *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6); *Palacios*, 46 S.W.3d at 875. We address appellants' issues together.

Appellants make numerous arguments concerning the alleged inadequacy of the reports. With respect to the malicious credentialing claim, appellants contend that the peer review privilege immunizes them from suit. Appellants argue that the reports fail to identify malice "or a specific intent to harm Ms. Abshire, her heirs, or patients in general." Appellants also assert that the reports fail to provide a report as to each of the appellants due to "a lack of [a] direct relationship between Ms. Abshire and two of the three [a]ppellants." In addition, appellants maintain that the experts' reliance upon certain standards for healthcare entities is "misplaced[,]" and that the experts had not "read [a]ppellants' bylaws prior to forming their opinion[s]." Appellants also assert that the experts' opinions are speculative and conclusory,

> particularly when the experts offer no detail about: (1) when Dr. Baker was granted initial privileges at the Houston hospital; (2) when Dr. Baker applied for renewal of his privileges; (3) what Dr. Baker told the Houston hospital in his applications[;] and (4) what the Houston hospital knew about Dr. Baker from other sources and when that information was discovered.

Appellants also complain that the experts instead "focus on public information to glean Dr. Baker's history[.]"

With respect to the report authored by Simpson, appellants argue that because Simpson's involvement with hospital quality assurance committees ended in 1997,[5] the report does not establish that Simpson was qualified to offer an expert report concerning a cause of action that arose in 2006. With respect to the negligence causes of action, appellants contend that the reports of Simpson and Lobato fail to adequately address the following: duty, breach, and proximate cause; each appellant; and each of appellees' "twenty-two counts of negligence[.]" Appellants also complain that Shorr "is not a physician and thus lacks the statutory qualifications

---

4. Appellants' issues are identical, except that issue one refers to Houston Community Hospital, Inc. d/b/a Renaissance Hospital, issue two involves Renaissance Hospital, Inc., and issue three pertains to Renaissance Healthcare Systems, Inc.

5. The curriculum vitae attached to Simpson's report indicates that Simpson last served on a hospital quality assurance committee in 1997.

to render opinion testimony on proximate causation. . . ."

According to appellants, contrary to the reports, nurses are not required to diagnose medical conditions, prescribe corrective measures, or second-guess physicians' diagnoses, and appellants argue that the reports do not provide a sufficient nexus between the nurses' alleged breaches and Abshire's cardiac arrest. Appellants maintain that the reports fail to address loss of chance, and that Texas law "does not permit recovery of damages for lost chance of survival or cure in medical negligence cases where the adverse result probably would have occurred anyway." In addition, appellants argue that the reports are based on assumption and speculation, and are conclusory. Furthermore, appellants argue that they "have denied being Dr. Webb's employer in their respective original answers[,]" and that they "are not liable for the acts of an independent contractor physician and the doctrine of *respondeat superior* does not apply."

■ Appellants' argument that the peer review privilege immunizes them from suit should be addressed in a motion for summary judgment or at trial, rather than in a motion to dismiss under chapter 74 of the Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6) (Statute requires that expert report provide a fair summary of the expert's opinions regarding the applicable standards of care, how the care that was provided failed to meet the standards, and the causal relationship between the failure and the alleged injury.); *Palacios,* 46 S.W.3d at 875; *see generally Wissa v. Voosen,* 243 S.W.3d 165, 169–70 (Tex.App.-San Antonio 2007, pet. denied) (Scope of physician's legal duty to patient was proper inquiry for summary judgment or trial, but "is simply not a determination contemplated or required under the statutory language of Chapter 74.").

Likewise, appellants' argument that *respondeat superior* does not apply because their answer denied that they were Webb's employer, as well as their argument that the experts improperly relied upon certain standards for healthcare entities and did not read appellants' bylaws, should be addressed at summary judgment or trial. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6); *Palacios,* 46 S.W.3d at 875; *Methodist Hosp. v. Shepherd–Sherman,* 296 S.W.3d 193, 199 n. 2 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (Whether the experts' conclusions are correct is an issue for either trial or summary judgment.); *Wissa,* 243 S.W.3d at 169–70.

In addition, appellants' argument that the expert reports state an inappropriate standard of care for the nurses (*i.e.,* that the nurses diagnose medical conditions, prescribe corrective measures, and second-guess physicians' diagnoses) should also be the subject of a motion for summary judgment or an issue at trial, not a motion to dismiss concerning the sufficiency of the expert reports. *See Shepherd–Sherman,* 296 S.W.3d at 199 n. 2. Furthermore, we note that Lobato's supplemental report clarifies that nurses are not required to practice medicine or to prescribe treatments, but that the standard of care for PACU nurses does require them to recognize the signs and symptoms of hypovolemia, and Lobato explains that the expansion of Abshire's abdomen would have been physically visible because of the volume of blood that was present.

■ With respect to appellants' argument that the reports are inadequate as to each of the appellants because of the lack of a direct relationship between Abshire and two of the three appellants, we note that the expert reports provided by Lobato, Simpson, and Shorr clearly ex-

plain that their opinions concerning the entities other than Renaissance Hospital—Houston are based upon the understanding that those entities share common ownership and are involved in a joint enterprise for the provision of healthcare services. "The theory of joint enterprise imputes liability to one who, although he did no wrong, is so closely connected to the wrongdoer that it justifies the imposition of vicarious liability." *David L. Smith & Assocs., L.L.P. v. Stealth Detection, Inc.*, 327 S.W.3d 873, 878 (Tex.App.-Dallas 2010, no pet.); *see also St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 517 (Tex.2002) (noting that joint enterprise is a theory of vicarious liability). When a petition asserts theories of liability that are purely vicarious, the conduct being called into question involves legal principles, and is not measured by a medical standard of care, since hospital entities cannot practice medicine. *See Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex.2008). Therefore, a report that adequately implicates the actions of the entity's agents or employees is sufficient. *Id.; Univ. of Tex. Sw. Med. Ctr. v. Dale*, 188 S.W.3d 877, 879 (Tex.App.-Dallas 2006, no pet.); *In re CHCA Conroe, L.P.*, No. 09–04–453 CV, 2004 WL 2671863, at *1 (Tex.App.-Beaumont Nov. 23, 2004) (orig. proceeding) (mem. op.).

Appellants cite no authorities supporting their contention that the experts' reliance upon information about Baker that was available in the public domain was improper. *See* Tex.R.App. P. 38.1(i) (An appellant's brief must contain appropriate citations to authorities.). In addition, appellants cite no authorities that hold that a report on a malicious credentialing claim is insufficient if the expert does not state that he has read the hospital's bylaws, and if the report does not discuss specifics concerning when the physician's privileges were granted and renewed, what the phy-

sician disclosed in his application, and when information from other sources was discovered.

Furthermore, although appellants cite section 74.351(a) of the Texas Civil Practice and Remedies Code, *Palacios*, and this Court's decision in *Beaumont Bone & Joint Institute, P.A. v. Slaughter*, those authorities do not stand for the proposition for which appellants cite them. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a); *Palacios*, 46 S.W.3d at 875; *Beaumont Bone & Joint Institute, P.A. v. Slaughter*, No. 09–09–00316–CV, 2010 WL 730152, at *4 (Tex.App.-Beaumont Mar. 4, 2010, pet. denied) (mem. op.).

Section 74.351(a) requires that a claimant must serve an expert report as to each healthcare provider against whom a "liability claim" is asserted. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). *Palacios* holds that the expert report must discuss "the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 875. Neither section 74.351(a) nor *Palacios* stands for the proposition that each specific factual allegation of negligence must be discussed in an expert report. *See id.* In *Slaughter*, this Court discussed four particular allegations in the plaintiff's petition, which we explained all constituted direct negligence claims, and held that a report was insufficient because it failed to adequately address the direct negligence claims. *Slaughter*, 2010 WL 730152, at *4. *Slaughter* does not stand for the proposition that an expert report must discuss each factual allegation of an act of negligence enumerated in a plaintiff's petition. Rather, *Slaughter* holds that the report

must address each type of negligence claim. *See id.* The twenty-two allegations in appellees' petition pertain to each of their general categories of claims: negligence, malicious credentialing, and gross negligence on the part of appellants, as well as Dr. Webb (for whose conduct appellees allege appellants are vicariously liable). Appellants' argument is an overly broad reading of the term "claim," and we decline to adopt that interpretation here. The reports, when considered together, adequately address each type of claim asserted by appellees.

With respect to appellants' argument concerning the reports' failure to address "loss of chance," we note that this is not a case in which the patient was already suffering from the injury or illness which ultimately led to her death. *See Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 398, 400 (Tex.1993) (In case involving failure to accurately diagnose a patient's cancer, the Supreme Court held that Texas law does not recognize a cause of action for loss of chance of survival when the adverse result would probably have "occurred anyway."). The reports by Lobato, Simpson, and Miller clearly explain that Baker caused Abshire's death when he transected her right iliac artery while performing a laminectomy and diskectomy, and failed to realize that he had done so; that is, the reports explain that if a competent physician had performed Abshire's surgery, her right iliac artery would, in reasonable medical probability, not have been transected, and she would not have died. The reports also clearly explain that if Webb had not referred Abshire to Baker, Baker would not have performed surgery on Abshire.

We now turn to appellants' arguments that Simpson was not qualified to offer an expert report concerning a cause of action that arose in 2006 because his involvement with hospital quality assurance committees ended in 1997, and that Shorr was unqualified to render an opinion concerning proximate causation because he is not a physician. Appellants cite the general statutory requirements for qualifications of an expert witness. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 74.402(b)(1), 74.403(a) (West 2011). Section 74.402(b)(1) provides as follows:

> (b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:
>
> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, *if the defendant health care provider is an individual,* at the time the testimony is given or was practicing that type of health care at the time the claim arose[.]

Tex. Civ. Prac. & Rem.Code Ann. § 74.402(b)(1) (emphasis added). By its express terms, section 74.402(b)(1) does not apply in this case, since appellants (the health care providers in question) are not individuals.

Section 74.403(a) states that a person may qualify as an expert witness regarding the causal relationship between the alleged departure from the standard of care and the injury only if the person is a physician and "is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence." *Id.* § 74.403(a). Simpson's report and curriculum vitae clearly establish that Simpson is a physician, and appellants do not contend that Simpson does not qualify as an expert under the Texas Rules of Evidence; therefore, we reject appellants' argument

that Simpson's lack of involvement in hospital quality assurance committees since 1997 renders him unable to qualify as an expert witness. Shorr is not a physician, and his report does not purport to offer an opinion concerning causation. Therefore, we also reject appellants' argument concerning Shorr's qualifications. *See id.* § 74.403(a).

■ We now turn to appellants' contentions that the expert reports are speculative and conclusory; fail to adequately address the standard of care, breach, and proximate cause; and fail to identify malice. Lobato explained that the standard of care required physicians and nursing personnel to recognize the signs of hemorrhage, and that if the nurses had promptly recognized Abshire's symptoms, summoned a physician to Abshire's bedside, and instituted the chain of command, Abshire would "more likely than not ... have been appropriately treated and her life saved." Lobato stated that the nurses' actions were, "in reasonable medical probability[,] the proximate cause of Ms. Abshire's death[,]" and that Abshire's death would have been prevented if the standard of care had been followed.

In his report, Simpson explained that the complaints filed by the TBME concerning Baker were publicly available, and Baker had a reputation for incompetence and drug use. Simpson explained that the standard of care required Webb to have a basic knowledge of the skills and professional reputation of the physician to whom he referred Abshire, and to refrain from sending Abshire to a physician with a documented history of drug use, malpractice, and repeated complaints by the TBME. Additionally, Simpson explained that Webb's referral of Abshire to Baker directly caused Baker to perform surgery on Abshire, and that if Baker had not been Abshire's surgeon, her artery would not

have been transected, gone undiscovered, and led to Abshire's death. Moreover, Simpson stated that because Webb's employer was owned and operated by the various Renaissance entities, Webb was an employee of the Renaissance entities, and the Renaissance entities were responsible for Webb's conduct.

Simpson indicated that appellants had a duty to follow JCAH standards in credentialing physicians, and that if they had denied or revoked Baker's surgical credentials, in all reasonable medical probability, a competent surgeon would have operated on Abshire, Abshire's artery would not have been severed, and Abshire would not have died. Simpson also opined that all of the Renaissance entities were responsible for credentialing Baker because the entities had common ownership or were involved in a joint enterprise. According to Simpson, the nurses breached the standard of care by failing to (1) recognize hypovolemia, (2) demand more aggressive fluid resuscitation, (3) demand the continuous presence of a physician at Abshire's bedside, and (4) institute the chain of command. Simpson's report also explained that if the PACU nurses had followed the standard of care, a physician would have realized that Abshire was hemorrhaging, provided appropriate treatment, and saved Abshire's life.

Miller explained in his report that the standard of care required Webb to use reasonable medical judgment to refer Abshire to a competent physician. According to Miller, Webb should have known of Baker's history through the TBME newsletter, information on the TBME website about complaints concerning Baker, the published court cases involving malpractice by Baker, and Baker's loss of privileges at two hospitals. Miller opined that Webb breached the standard of care by referring Abshire to Baker because Webb failed to

ascertain Baker's qualifications, and that if Webb had not referred Abshire to Baker, Abshire "would not have undergone surgery by ... Baker, would not have had her iliac artery mistakenly and negligently severed during surgery, and would not have died." Because Miller understood that appellants owned Beaumont Spine, where Webb practiced medicine, Miller incorporated his criticisms of Webb into those directed against appellants.

In his report, Shorr explained that the standards applicable to Renaissance Hospital require that before granting privileges, the hospital must evaluate challenges to the applicant's licensure, any relinquishment of the license, termination of medical staff membership, limitation, reduction, or loss of clinical privileges, evidence of an excessive number of liability actions, and health status; must compare practitioner-specific data to aggregate data; and must review morbidity and mortality data. Shorr also explained that when an applicant's privileges are renewed, his ability to perform the requested privileges must be evaluated. Additionally, Shorr stated that a hospital must have a governing body that is responsible for appointing medical staff, and the governing body must examine an applicant's individual character, competence, training, experience, and judgment. Shorr opined that appellants breached the applicable standards by maliciously and negligently credentialing Baker despite his well-documented history of malpractice, drug addiction, mental problems, and loss of privileges at other hospitals. Shorr explained that if appellants had employed the required procedures, they would have discovered Baker's malpractice history and his loss of privileges at other institutions.

Shorr stated that appellants breached the standard of care because they either failed to engage in a proper credentialing process in granting or renewing Baker's privileges, or ignored the information they gathered. Shorr opined that appellants' failure "to prevent Dr. Baker from obtaining or maintaining orthopedic surgery privileges at the Hospital is evidence of it[s] grossly negligent and malicious acts in that the Hospital either failed to follow any credentialing procedure at all, or if it did do any investigation, it knew of the extreme degree of risk Dr. Baker posed to its patients and credentialed him anyway." Finally, like the other experts, Shorr explained that his criticisms of the hospital were imputed to the other appellants because they shared common ownership or were involved in a joint enterprise.

Reviewing the expert reports together, we conclude that the reports discuss the standards of care, breach, and causation with sufficient specificity as to each of the appellants to inform appellants of the conduct appellees have called into question and to provide a basis for the trial court to conclude that the claims have merit. *See Palacios,* 46 S.W.3d at 875; *see also Doades,* 94 S.W.3d at 671–72; *Rittmer,* 65 S.W.3d at 722–23; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(i). Accordingly, we overrule appellants' issues and affirm the trial court's judgment.

AFFIRMED.