**Opinion issued March 21, 2013**



In The

**Court of Appeals**

**For The**

**First District of Texas**

_____

**NO. 01-12-00390-CV**

_____

**IPH HEALTH CARE SERVICES, INC., Appellant**

**V.**

**JOHN RAMSEY AND JENNIFER RAMSEY, Appellees**

**On Appeal from the 23rd District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 63804**

**MEMORANDUM OPINION**

In this interlocutory appeal,[1] appellant, IPH Health Care Services ("IPH"), challenges the trial court's order denying its motion to dismiss the health care

---

[1]    *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (Vernon Supp. 2012).

liability claim[2] made against it by appellees, John Ramsey and Jennifer Ramsey, in their suit for negligence. In its sole issue, IPH contends that the trial court erred in not dismissing the Ramseys' claim.

## Background

In their original petition, the Ramseys assert a health care liability claim against IPH, Dr. Mohammad Khan, M.D., and Dr. O.C. Oandasan, M.D., alleging that John was hospitalized on March 30, 2009, for a "suspected stroke." He was ultimately diagnosed with endocarditis, an infection of the heart characterized by heart-valve vegetation growth. On April 9, John underwent "mitral valve surgical debridement" to repair and remove the "vegetation which had grown on his mitral valve." Khan discharged John on April 14 with follow up treatment to be administered by his primary care physician, Oandasan. From April 14 to April 24, John received treatment at his home from IPH, a licensed Home and Community Support Services Agency,[3] which administered to him "two potent antibiotics": vancomycin and gentamycin. During this time, John "developed signs and symptoms of severe antibiotic overdose," but IPH "did not take action as required

---

[2] *See id.* § 74.001(a)(13) (Vernon Supp. 2012).

[3] For purposes of a health care liability claim, a "health care institution" includes "a home and community support services agency." *See id.* § 74.001(a)(12)(A)(vii), (11)(E).

2

by the standard of care for a home health network."  Although IPH "did attempt to communicate information" to Oandasan about John's condition, Oandasan "either failed to review" or "ignored" the information.

By April 24, the levels of vancomycin and gentamycin in John's system were "off the chart," his renal function was "severely compromised," and he felt "lethargic with a cough and fever."  IPH staff contacted an on-call doctor for Dr. Oandasan, Dr. Bui, who warned that John "should go to the emergency room 'or he would die.'"  John who was ultimately diagnosed with Stevens-Johnson Syndrome, lapsed into a coma and underwent years of treatment and therapy.  As a result of the incident, he is "totally disabled" with "persistent vertigo from vestibular damage, left side weakness, cognitive disorder, memory loss, tinnitus, migraine headache syndrome, depression, and other issues all arising from the antibiotic overdose."

The Ramseys allege that IPH "deviated from the standard of care involved in providing [John's] home IV antibiotics treatment." The Ramseys specifically allege that IPH was negligent by:

1) failing to recognize signs of overdose of vancomycin and gentamycin;

2) failing to immediately contact a physician when [John] exhibited severe urticaria, fever, lethargy, itching and altered mental status;

3) sending lab results to the wrong doctor; and

3

4)      failing to take immediate emergency action when critical lab results were received.

The Ramseys further allege that IPH's "deviation[s] from the standard of care," in addition to those of Dr. Khan and Dr. Oandasan, were "the proximate cause of the severe iatrogenic antibiotic toxicity which resulted in [John's] permanent injury and disability."

The Ramseys served IPH with an expert report[4] authored by Dr. Charles J. Chitwood, M.D., a practicing physician.  In the section of his report entitled, "Qualifications," Chitwood notes that he is board certified in Family Medicine, works in a "large Community Medical Center's Department of Family Medicine, " has practiced a "full range of family medicine," and has treated "many patients over the years with endocarditis (both native and artificial valves)."  He explains that he has "personally supervised the medical management of multiple patients with infectious endocarditis, to include developing the treatment plan, ordering, administering and monitoring intravenous antibiotics and writing the detailed home health discharge planning and follow-up schedules."  Chitwood "always handled the diagnosis, work-up, treatment and follow-up of serious infectious disease cases

---

[4]     *See id.* § 74.351 (Vernon 2011) (requiring expert report to be served in health care liability claims).

4

with the highest of priority." He also has "served as the primary care manager for a multitude of patients over the years, always in collaboration with a holistic care team, to include home health nursing services. . . . [and] consulted multiple home health companies for myriad patient needs, ranging from home oxygen therapy, to supportive ventilator devices and long-term intravenous antibiotics." And Chitwood explains that he is "very familiar with home health care and ha[s] conducted many home health visits [him]self and actually worked for 'House Call Doctors' for quite some time." Based on these and other qualifications, Chitwood asserted that he is "qualified to review and prepare an expert opinion regarding this case."

In his report, Dr. Chitwood notes that John was first admitted into emergency care on March 19, 2009, exhibiting symptoms that "painted a worrisome picture for endocarditis." However, he was released on oral antibiotics, including vancomycin, with no diagnosis of endocarditis. The physician ordered the pharmacy "'to manage Vancomycin,' indicating an understanding of the meticulous care required when overseeing this drug with multiple potential serious side effects." Subsequently, on March 30, after a follow-up examination, John was referred to Dr. Khan, who performed tests on John that revealed "mitral valve vegetations." Khan began a "broad-spectrum antibiotic regiment," and on April 9, John underwent mitral valve surgical debridement to remove the heart valve

5

vegetation. He was discharged on April 14 "with a plan for long-term vancomycin and gentamycin" as recommended by the hospital's Infectious Disease Consultant, Dr. Farooq.

Dr. Chitwood notes that Dr. Khan provided an "addendum to the discharge summary . . . months after [John's] release," which he read as an "attempt to underscore all of the risks and concerns that should have been addressed in April." Chitwood explained that, on April 10, Dr. Farooq stopped treating John with vancomycin due to "metabolic/allergic concerns." Nevertheless, Khan prescribed vancomycin for John four days later, upon his discharge. Chitwood could see no "rationale" for the change in John's medication.

From April 14 to April 24, John was under the care of IPH, which administered vancomycin and gentamycin intravenously pursuant to the hospital discharge plan. During this time, John developed symptoms of antibiotic overdose. By April 24, John's mental status and sense of balance had deteriorated and he had a markedly worsening skin rash with swelling. Dr. Chitwood notes that the "problem began soon after his transfer home."

When John began exhibiting symptoms of vancomycin and gentamycin overdose, IPH could not contact Dr. Khan because it had "the wrong contact points." It actually had contact information for another Dr. Khan in McKinney,

Texas, rather than the Dr. Khan who treated John. IPH's earliest notes show Dr. Oandasan as the primary attending physician.

IPH notes, signed by Betty Woodard on April 15, show that John was then exhibiting a rash on his torso and IPH was to "notify MD in am." Notes from a different nurse, recorded the next day, have no mention of the rash or whether a doctor was contacted. Dr. Chitwood opines that reasonable nurses and physicians would recognize the rash as a severe allergic reaction and "not taking immediate action to mitigate this reaction" is "[a] clear deviation from the standard of care."

IPH notes from April 17 show "a gentamycin trough of 3.6 (normal 0-2.0 mcg/dl)" with the results faxed, presumably to the wrong Dr. Khan. The notes also show that a nurse also called and left a message at "BRHS." By April 20, the gentamycin trough had "climbed to 12.4" and the vancomycin trough was also "elevated at 28.3 (normal 5-20 mcg/dl)." IPH communicated with Dr. McFadden, who stopped the gentamycin dose, ordered it restarted later at half strength, and ordered a follow up in one week. The rash was not reported to McFadden, and the repeat levels on April 24 were sent to Dr. Oandasan.

A resident nurse also wrote an "addendum progress note," which states that "multiple attempts to notify [Dr. Oandasan] of treatment and lab results were unsuccessful. [Oandasan] stated to notify Dr. Khan or Dr. McFadden. Dr. Khan when contacted stated to notify [Oandasan]." IPH notes, dated April 24, show that

7

John was "lethargic with a cough and fever" and "[l]eft voicemail." Dr. Chitwood opines that at this juncture, with a critically ill patient, "calling 911 would have been the prudent course of action and a failure to take immediate action was a clear deviation from the standard of care."

Additional progress notes by an IPH nurse, according to Dr. Chitwood, reveal the "confusion and poor management of this patient's condition and treatment." The notes state, "during the course of treatment for the patient, multiple attempts to notify PCP of treatment and lab results were unsuccessful. PCP stated to notify Dr. Khan or Dr. McFadden. Dr. Kahn when contacted stated to notify PCP."

Ultimately, an on-call doctor advised IPH personnel to transport John to an emergency room. On April 24, John was readmitted to the hospital with symptoms of an allergic reaction to the prescribed antibiotics and antibiotic overdose. His lab results demonstrated "severe antibiotic toxicity," and the levels of vancomycin and gentamycin in his system were "astronomically 'off the chart' in fatal toxicity regions." John was in critical condition and diagnosed with Stevens-Johnson Syndrome.

In regard to the standard of care applicable to IPH, Dr. Chitwood explains that "the discharge is a period of transition from hospital to home that involves a transfer in responsibility from the hospitalist to the patient and primary care

8

physician." And "[o]ngoing monitoring and care are equally important." Chitwood continues,

> IPH staff failed to recognize signs of a true medical emergency; severe urticarial, fever, lethargy, itching and change in mental status. Any of these alone, and certainly combined, would lead any prudent and reasonable nurse to force immediate contact with a physician. Instead of routine efforts to leave messages with the doctor's answering service, the treating nurses should have called 911 at the very 1st sign of severe adverse drug reactions. I remain confused as to how IPH tried to send lab results to the wrong Dr. Kahn in McKinney, Texas which is outside Dallas, when all parties were located in the Lake Jackson/South of Houston region of Texas? Finally, when critical labs were received, more extreme measures to contact the treating physician should have been made, along with contacting EMS for patient transport to a medical facility for acute evaluation and treatment of severe antibiotic reactions. Failure by IPH and multiple IPS nurses to take appropriate action when faced with a critical medical emergency breaches the standard of care.

Dr. Chitwood further explains in his report that, in all reasonable medical probability, with the early detection and response he described, John would not have suffered any of the severe medical maladies that resulted from the antibiotic toxicity. He opines:

> The breach of the standard of care by both Drs. Oandasan and Kahn and IPH's staff's failure to identify and appropriately respond to the very obvious, characteristic signs of Vancomycin and gentamycin toxicity substantiated with objective serum antibiotic level lab measurements which were ignored, were the cause in the delayed diagnosis and this delay was the proximate cause of the certainty of <u>permanent disability</u> and need for extensive treatment described herein.
>
> Standard of care NOT met by Drs. Oandasan, Kahn and IPH Health Services. I believe with a reasonable degree of medical

9

certainty that the above described delays, oversight and submaximal care caused Mr. Ramsey's cutaneous, vestibular, renal and neurologic damages.

In its answer, IPH generally denied the Ramseys' allegations. IPH objected to Dr. Chitwood's expert report on the grounds that it is insufficient and Chitwood is unqualified to render an opinion as to IPH's standards of care or IPH's alleged breach of those standards. IPH also objected to Chitwood's report as not specifically setting forth the applicable standards of care for IPH, or specifically identifying how IPH fell below the standards of care. IPH asserted that Chitwood, in his expert report, makes only conclusory allegations regarding causation and "fail[s] to specifically explain how IPH's alleged breach of care specifically caused [John's] alleged injuries." In their response, the Ramseys asserted that Chitwood's report is adequate. They attached an amended report to their response, along with a request for a 30-day extension[5] to file the amended report, "[s]hould any aspect of [the] initial report be found inadequate."

After a hearing, the trial court granted the Ramsey's request for a 30-day extension to file the amended report. It overruled the objections to the report made by IPH and the other defendants. IPH later filed a second motion to dismiss the

---

[5]    *See id*. § 74.351(c). In their brief, the Ramseys assert that their request for a 30-day extension was unopposed.

Ramseys' health care liability claim made against it, and the trial court denied IPH's motion.

## Standard of Review

We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex. 2001); *Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas,* 328 S.W.3d 526, 539 (Tex. 2010). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Harris Cnty. Hosp. Dist. v. Garrett,* 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

## Sufficiency of Expert Report

In its sole issue, IPH argues that the trial court erred in denying its motion to dismiss the Ramseys' health care liability claim because Dr. Chitwood "lacks the expertise necessary to provide an opinion on the standard of care to be followed by IPH," "the alleged breach of care committed by IPH," and "the causation of [the

11

Ramseys'] injuries based on IPH's alleged breach." It also asserts that Chitwood's expert report "does not address the standard of care, breach or causation of damages . . . as to [] IPH."

A health care liability claimant must timely provide each defendant health care provider with an expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (Vernon 2011); *Gray,* 189 S.W.3d at 858. The expert report must provide a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

If a defendant files a motion to dismiss challenging the adequacy of the claimant's expert report, a trial court shall grant the motion to dismiss only if it appears to the court, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report. *Id.* § 74.351(l). The only information relevant to the inquiry is that contained within the four corners of the report. *Palacios,* 46 S.W.3d at 878. Although the claimant need not marshal all of his proof in the report, the report must include the expert's opinion on each of the elements identified in the statute. *See id.* at 878–79; *Gray,* 189 S.W.3d at 859.

12

In setting out the expert's opinions, the report must provide enough information to fulfill two purposes to constitute a good faith effort. *Palacios,* 46 S.W.3d at 879. First, the report must inform the defendant of the specific conduct the claimant has called into question. *Id.* Second, the report must provide a basis for the trial court to conclude that the claim has merit. *Id.* A report that merely states the expert's conclusions does not fulfill these two purposes. *Id.* The expert must explain the basis of his statements to link his conclusions to the facts. *Bowie,* 79 S.W.3d at 52. However, a claimant need not present evidence in the report as if he were actually litigating the merits. *Palacios,* 46 S.W.3d at 879. Furthermore, the report may be informal in that the information in the report need not meet the same requirements as the evidence offered in a summary-judgment proceeding or trial. *Id.* We review the sufficiency the report by looking at the four corners of the report. *See Palacios,* 46 S.W.3d at 878.

*Qualifications*

IPH first asserts that Dr. Chitwood does not possess the special knowledge required or is not "specially qualified" to render an opinion regarding the acts and omissions of a home support services agency. IPH also asserts that Chitwood is "not qualified to provide an opinion . . . based on training or experience." We note at the outset that a physician is not automatically disqualified from rendering an expert opinion regarding other types of health care providers, such as home health

13

support services, even though the standard of care may be different for those providers. *See Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 198 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 558 (Tex. App.—Dallas 2009, no pet.). If the physician is familiar with the standard of care for other health care providers, such as home health support services, based on experience working with or supervising them, then he or she may be qualified to render an opinion. *See Shepherd-Sherman*, 296 S.W.3d at 198 (concluding physician qualified to render expert opinion on standard of care of hospital based on his experience in hospital admissions and working with hospital personnel when patients request specific doctors); *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 813–14 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (concluding physician qualified as expert to state standard of care for nurse in preventing bed sores based on previous work with nurses in same situation).

A person may qualify as an expert in a suit involving a health care liability claim against a health care provider, including a home health services provider, only if the person:

> (1)    is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care

14

provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;[6]

(2) has knowledge of accepted standards of medical care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b) (Vernon 2011). An expert providing testimony regarding whether a health care provider departed from the accepted standards of health care must satisfy the requirements of section 74.402. *See id.* § 74.351(r)(5)(B).

In determining whether a witness is qualified "on the basis of training or experience," the court shall consider "whether, at the time the claim arose or at the time the testimony is given, the witness . . . (1) is certified by a licensing agency . . . or has other substantial training or experience, in the area of health care relevant to the claim; and (2) is actively practicing health care in rendering health care services relevant to the claim." *Id.* § 74.402(c). "Practicing health care" includes,

---

[6] By its express terms, this subsection of section 74.402 does not apply because the health care providers here are not individuals. *See Renaissance Healthcare Sys., Inc. v. Swan*, 343 S.W.3d 571, 588 (Tex. App.—Beaumont 2011, no pet.).

15

(1)      training health care providers in the same field as the defendant health care provider at an accredited educational institution; or

(2)      serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

*Id*. § 74.402(a).

An expert report by a person not qualified to testify does not represent a good-faith effort to comply with the definition of an expert report. *Foster v. Zavala,* 214 S.W.3d 106, 116 (Tex. App.—Eastland 2006, pet. denied) (citing *In re Windisch*, 138 S.W.3d 507, 511 (Tex. App.—Amarillo 2004, orig. proceeding) (interpreting predecessor statute to section 74.351)).

Different standards of care apply to physicians and other health care providers, including home health support agencies. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b). A physician may testify as to the applicable standard of care for nurses, nurse practitioners, and physicians assistants. *See Wallace*, 278 S.W.3d at 558. If a physician states in his expert report that he is familiar with the standard of care for the applicable health care providers and the prevention and treatment of the illness, injury, or condition involved in the claim, the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b); *Bennett*, 256 S.W.3d at 814.

IPH argues that Dr. Chitwood does not possess special knowledge regarding the delivery of home health care or home support because he is a family practice physician who practices in a traditional clinical office setting and "not as a deliverer of home support services." IPH asserts that Chitwood "is not qualified to address the issues of standard of care, breach, and causation as it applies to IPH, a home support services agency." In support of its argument, IPH cites *Chisholm v. Maron*, 63 S.W.3d 903, 907 (Tex. App.—Amarillo 2001, no pet.) and *Richburg v. Wolf*, 48 S.W.3d 375, 378 (Tex. App.—Eastland 2001, pet. denied).

In *Chisholm*, the Amarillo Court of Appeals held that to meet the statutory requirement that a physician expert be actively practicing medicine, it was required that the physician expert have experience in the particular field of the defendant doctor, orthopedic surgery. 63 S.W.3d at 907 n.1. In *Richburg*, the expert was found to be unqualified to render an expert opinion because although the report revealed that the expert had a distinguished medical career, it demonstrated no expertise specific to the reconstructive breast surgery performed by the physician defendant. 48 S.W.3d at 378. Dr. Chitwood's expert report does not suffer from the same deficiencies.

Here, the Ramseys had to demonstrate that Dr. Chitwood has knowledge of the accepted standards of care for the diagnosis, care, or treatment of John's injury or condition. *See* TEX. CIV. PRAC. & REM. CODE § 74.402(b)(2). In his expert

17

report, Chitwood states that is he familiar with the standard of care as it pertains to the treatment and care of infectious endocarditis, the infection for which John was hospitalized. In a section of his report entitled, "Application of Facts and the Standard of Care. The Question of Negligence," Chitwood explains and applies the facts of John's illness to the applicable standards of care for IPH and Drs. Khan and Oandasan. Specifically pertaining to IPH as a home health services provider, Chitwood details a knowledge of what home health care professionals are expected to do when caring for an intravenous patient experiencing severe allergic reactions to antibiotics. He details what is expected of home health care staff and how IPH failed to meet that standard. Chitwood notes in his report that he has treated patients with endocarditis, both individually and in a team setting, and he has handled the diagnosis, work-up, treatment, and follow-up in these cases. And he has been required to coordinate the care of patients with such serious infections. Chitwood further states that he has worked with home health care personnel overseeing the administration of intravenous antibiotics, and he provides details from treatises on the side effects of gentamycin and vancomycin overdoses, the toxicity of which is well known in many fields of medicine. Chitwood outlines his experience "personally supervis[ing] the medical management of multiple patients with infectious endocarditis, to include developing the treatment plan, ordering, administering and monitoring intravenous antibiotics and writing detailed home

health discharge planning and follow-up schedules." He also has experience consulting with multiple home health companies for various patient care needs, including cases in which antibiotic therapy was conducted in patient homes, resulting in diagnoses, including osteomyelitis, pulmonary abscesses, tuberculosis, and endocarditis. Moreover, Chitwood has conducted many home health care visits and worked for "House Call Doctors," noting that he is "very familiar with home health care."

IPH complains that Dr. Chitwood, in his report, does not define what the applicable standard of care is for IPH, and it asserts that he is unaware of the three statutory authorities that "govern and regulate the standards of care related to home support service agencies," specifically the Texas Administrative Code, the Texas Government Code, and the Texas Health and Safety Code. IPH asserts that, as a home health support service, it is required to comply with the statutes governing home support services and regulations found in the Texas Administrative Code.

In his expert report, Dr. Chitwood opines that IPH breached its standard of care by failing to take immediate action when an IPH nurse observed and noted a red, slightly raised rash on John's torso. He explains that such a rash "prompts most reasonable nurses and physicians to think of a potentially SEVERE allergic reaction and intervention should have taken place then. . . [n]ot taking immediate action [was] . . . [a] clear deviation from the standard of care." Chitwood also

19

opines that when IPH was unable to obtain a response from Dr. Oandasan's office, "calling 911 would have been the prudent course of action and failure to take immediate action was a clear deviation from the standard of care."

The Texas Administrative Code sets forth a list of "core standards" for home health service providers, but it does not articulate any standards of care for home health service providers. As IPH concedes in its briefing to this Court, a standard of care for a home health services provider is that which an ordinary and prudent home support agency employee would do under the same or similar circumstances. *See Palacios*, 46 S.W.3d at 880. Dr. Chitwood simply was not required to state that his familiarity with the core standards contained in the administrative code. *See Cook v. Spears*, 275 S.W.3d 577, 583 (Tex. App.—Dallas 2008, no pet.); *Simonson v. Keppard*, 225 S.W.3d 868, 873 (Tex. App.—Dallas 2007, no pet.).[7] Chitwood was, in his report, required to demonstrate his familiarity with the pertinent standards of care of home health service providers under the same or similar circumstances as presented in this case, i.e., what an ordinary prudent home

---

[7] In *Simonson*, the court held that a doctor was not qualified to report on the standard of care applicable to an advanced practice nurse because the doctor did not state that he "had any familiarity with the standard of care for a nurse practicioner." 225 S.W.3d at 873–74. The court did not decide the case on an alleged articulation of a plainly erroneous standard of care, but rather held that the expert was not qualified to state a standard of care for that particular profession. *Id*. In contrast, Dr. Chitwood states that he is familiar with the standard of care for home health care services.

health service provider would have done instead of what IPH actually did or failed to do. Indeed, in his report, Chitwood states that he is "very familiar with home health care and ha[s] conducted many home health visits [him]self and actually worked for 'House Call Doctors' for quite some time." He explained that this experience has led to "familiarity with [the] standard of care as it applies to home health antibiotic administration, monitoring and supervision. I am also familiar with [the] standard of care . . . applie[d] to handling medication errors, adverse reactions, and reporting in the home health care field."

Further, if a physician states his familiarity with the pertinent standard of care and the responsibilities and requirements of a home health care support services provider, and he has worked with, interacted with, and supervised in the home health care field, the physician is qualified on the issue of whether a home health care support services provider departed from the pertinent accepted standards of care. *See Cook*, 275 S.W.3d at 582–84 (distinguishing *Simonson*).

In his report, Dr. Chitwood opines that IPH breached the pertinent standard of care when:

> IPH staff failed to recognize signs of a true medical emergency; severe urticaria, fever, lethargy, itching and change in mental status. Any of these alone, and certainly combined, would lead a prudent and reasonable nurse to force immediate contact with a physician. Instead of routine efforts to leave messages with the doctor's answering service, the treating nurses should have called 911 at the very 1st sign of severe adverse drug reactions. I remain confused as to how IPH tried to send lab results to the wrong Dr. Kahn in McKinney, Texas

21

which is outside Dallas, when all parties were located in the Lake Jackson/South of Houston region of Texas? Finally, when critical labs were received, more extreme measures to contact the treating physician should have been made, along with contacting EMS for patient transport to a medical facility for acute evaluation and treatment of severe antibiotic reactions. Failure by IPH and multiple IPS nurses to take appropriate action when faced with a critical medical emergency breaches the standard of care.

Because Dr. Chitwood has over eighteen years of medical experience, including ambulatory, urgent, and emergent care, he possesses specialized knowledge on "subject matter [that] is common to and equally recognized and developed in all fields of practice," such as hospital discharge, recognizing the importance of patient history, and the infection process, all of which are addressed in his report. *See Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *Hersh v. Hendley*, 626 S.W.2d 151, 155 (Tex. Civ. App.—Fort Worth 1981, no writ) (labeling "taking a medical history" and "discharge before complete recovery" as "acts related to practices which are commonly and equally recognized in all fields of practice"); *Garza v. Keillor*, 623 S.W.2d 669, 671 (Tex. Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) ("[T]he standard of care in the infection process . . . is common to and equal in all fields of medical practice").

Additionally, Dr. Chitwood possesses specialized knowledge particular to John's treatment. In his report, Chitwood indicates that he has "supervised the medical management of many patients with infectious endocarditis," which is the same type of the infection for which John was originally hospitalized. Chitwood's

22

medical management included developing treatment plans; ordering, administering, and monitoring intravenous antibiotics; and writing detailed home health discharge plans with follow-up schedules. The Ramseys' claim involves each of these areas of experience. Chitwood's experience also includes consulting with home health companies for patient needs, including the administration of long-term intravenous antibiotics. This claim also involves the coordination between a doctor and a home health services company regarding the dispensation of antibiotics intravenously.

The trial court could have reasonably concluded that Dr. Chitwood "has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in [this] claim." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(2). Thus, his expert report satisfies the requirements of section 74.402(b)(2). *See Group v. Vicento*, 164 S.W.3d 724, 734 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (holding that doctor's statement of knowledge of standard of care for the injury or illness at issue satisfies the requirements of section 74.402(b)(2)).

The Ramseys had to further demonstrate that Dr. Chitwood is qualified on the basis of his training or experience. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(3). To determine whether Chitwood is qualified under section 74.402(b)(3), we consider whether he is (1) certified by a licensing agency or has

substantial training or experience relevant to the claim and (2) actively practicing health care relevant to the claim. *See id.* § 74.402(c).

IPH argues that Dr. Chitwood is not qualified as an expert because he is not licensed in the specific field of home health care support services. We note that the statute requires certification by a licensing agency, but it does not specifically require licensure in the same field of practice as the health care provider. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(c)(1); *see also Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003) (physician board certified in pediatrics but not neurology could offer expert opinion on neurological injuries when particular issue in case involved pediatric neurological injury, an area in which the expert had considerable knowledge and experience). Here, it is undisputed that Chitwood is currently licensed by the Texas State Board of Medical Examiners in Family Medicine and currently practices "in a large Community Department of Family Medicine." And he has been board certified in Family Medicine for 12 years.

Because section 74.402(c)(1) is phrased in the disjunctive, we may also consider whether Dr. Chitwood is qualified on the basis of his training or experience if he "has other substantial training or experience in the area of health care relevant to the claim." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402 (c)(1). And, as described above, Chitwood possesses substantial training and experience relevant to this claim. He indicates that "as a Board Certified,

24

independent staff physician" with "over 18 years of ambulatory, urgent and emergent care experience," he has experience with treating endocarditis, including "developing the treatment plan, ordering, administering and monitoring intravenous antibiotics and writing the detailed home health discharge planning and follow-up schedules." And again, Chitwood is currently practicing as a staff physician in family medicine at a large community medical center.

Further, specific to home health services, Dr. Chitwood states that he is very familiar with home health care and has conducted many home health visits as a physician and when he was employed by "House Call Doctors." Chitwood has also served as a primary care manager for many patients and collaborated with a care team, including home health nursing services. His experience also includes consulting with multiple home health companies.

The trial court could have reasonably concluded that Dr. Chitwood has substantial training or experience in an area of health care relevant to the Ramseys' claim under section 74.402(c)(1) and he is actively practicing health care in rendering health care services relevant to the Ramseys' claim as required under section 74.402(c)(2). Thus, his expert report satisfies the requirements of section 74.402(b)(3). Accordingly, we hold that the trial court did not err in denying IPH's motion to dismiss the Ramsey's health care liability claims on the ground that Chitwood is not qualified to render his opinion.

25

*Standard of Care and Breach*

IPH next asserts that Dr. Chitwood, in his expert report, makes only generalized "conclusory" remarks regarding the applicable standard of care, does not clearly define the applicable standard of care for IPH, and fails to enumerate the steps that IPH employees should have taken to comply with the standard of care.

Identifying the standard of care in a health care liability claim is critical: whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios,* 46 S.W.3d at 880. While a "fair summary" is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given. *Id.* When a plaintiff sues more than one defendant, the expert report must set forth the standard of care for each defendant and explain the causal relationship between each defendant's individual acts and the injury. *See Doades v. Syed*, 94 S.W.3d 664, 671–72 (Tex. App.—San Antonio 2002, no pet.); *Rittmer v. Garza*, 65 S.W.3d 718, 722 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

In his report, Dr. Chitwood's explains,

IPH staff failed to recognize signs of a true medical emergency; severe urticarial, fever, lethargy, itching and change in mental status. Any of these alone, and certainly combined, would lead any prudent and reasonable nurse to force immediate contact with a physician.

26

Instead of routine efforts to leave messages with the doctor's answering service, the treating nurses should have called 911 at the very 1st sign of severe adverse drug reactions. I remain confused as to how IPH tried to send lab results to the wrong Dr. Kahn in McKinney, Texas which is outside Dallas, when all parties were located in the Lake Jackson/South of Houston region of Texas? Finally, when critical labs were received, more extreme measures to contact the treating physician should have been made, along with contacting EMS for patient transport to a medical facility for acute evaluation and treatment of severe antibiotic reactions. Failure by IPH and multiple IPS nurses to take appropriate action when faced with a critical medical emergency breaches the standard of care.

The pertinent standard of care identified by Chitwood required that IPH recognize the medical emergency and force immediate contact with a physician. Rather than leaving messages for Drs. Khan and Oandasan, the standard of care, when dealing with a critically ill patient, required immediate telephoning for emergency medical assistance for the transport of John to a medical facility for acute diagnosis and treatment. Chitwood indicates that the specific risks associated with vancomycin toxicity are renal side effects, nervous system damage, hematologic complications, and "red man syndrome," among others. He further identifies IPH's failure to comply with the standard of care when it failed to have John transported to a hospital when IPH received abnormal critical lab reports and that the failure to do so breached the standard of care for home health personnel. Chitwood also specifies that IPH's failure to show that it had followed up with the physician after noting the generalized rash was a deviation from the standard of care. When IPH notified Dr. McFadden of the second lab results showing high levels of gentamycin

27

and vancomycin, it failed to also inform him about the rash which indicated a severe allergic reaction. Chitwood opines that IPH's delayed reaction allowed John's condition to deteriorate to a critical level when his antibiotic levels reached fatal toxicity range. And he explains how these failures breached the standard of care.

Thus, the trial court could have reasonably concluded that Dr. Chitwood's report represents a "good faith effort" to inform IPH of the specific conduct called into question, the standards of care that should have been followed, and what it should have done differently. Accordingly, we hold that the trial court did not err in denying IPH's motion to dismiss the Ramsey's health care liability claims on the ground that Chitwood's expert report makes only "conclusory" assertions and fails to identify the pertinent standards of care and breach of the standards.

*Causation*

Finally, IPH argues that Dr. Chitwood "wholly fails to address causation" because his report does not "link up" his conclusions to the damages and fails to "establish what actual injuries/damages (if any) were caused by the alleged negligence of IPH." It asserts that Chitwood's report "does not show causation beyond that of mere conjecture." As noted above, an expert report must provide a fair summary of the expert's opinions regarding the causal relationship between the failure of the health care provider to provide care in accord with the pertinent

28

standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

In support of its argument, IPH relies on *Bowie Memorial Hospital v. Wright*, 79 S.W.3d 48 (Tex. 2002). In *Bowie*, the plaintiff alleged that a physician's assistant misread or misplaced an x-ray and, therefore, did not discover that the plaintiff had fractured her foot. *Id.* at 50. Approximately one month later, the plaintiff's orthopedic surgeon discovered the fracture. *Id.* The plaintiff filed the report of an expert, who stated that had the x-ray been properly read, she "would have had the possibility of a better outcome." *Id.* at 51. The court, after recognizing that a report need not use any particular phrase, held that the trial court could have reasonably determined that the report did not represent a good-faith effort to summarize the causal relationship. *Id.* at 53. The court noted that the report simply opined that the plaintiff had a "possibility of a better outcome," and it did not sufficiently "[link] the expert's conclusion (that [the plaintiff] might have had a better outcome) to [the hospital's] alleged breach (that it did not correctly read and act upon the x-rays)." *Id.*

Here, in contrast, Dr. Chitwood opines in his expert report that, "[i]n all reasonable medical probability, with proper oversight, early detection and response in this case, even as conducted, [John] would not have suffered any of the severe medical maladies resulting from his antibiotic toxicity." He also states that the

29

doctors' and IPH's breach of their standards of care "[was] the cause in the delayed diagnosis and this delay was the proximate cause of the certainty of permanent disability and need for extensive treatment described herein." He continues, "I believe within a reasonable degree of medical certainty that the above described delays, oversight and submaximal care caused [John's] . . . damages." *See Linan v. Rosales*, 155 S.W.3d 298, 305–06 (Tex. App.—El Paso 2004, pet. denied) (affirming verdict in favor of plaintiff for doctor's failure to timely diagnose cancer); *In re Barker*, 110 S.W.3d 486, 491 (Tex. App.—Amarillo 2003, orig. proceeding) (concluding expert report sufficient in stating that negligent failure to recognize medical condition and delay in treatment increased severity of plaintiff's injuries).

In his report, Dr. Chitwood indicates that IPH failed to recognize and respond to a severe allergic reaction and lab results showing toxic levels of antibiotics, and he opines that the breach in the standard of care was a cause in the delayed diagnosis of John's condition. The specific risks associated with vancomycin toxicity include renal side effects, nervous system damage, hematologic complications, "red man syndrome," and Stevens-Johnson Syndrome, among others. John actually suffered from renal side effects, nervous system damage, hematologic complications, "red man syndrome," and Stevens-Johnson Syndrome. In Chitwood's professional opinion, John suffered these effects "due to

a failure of recognition and treatment." Chitwood provided a fair summary of his opinion that IPH failed to meet the standard of care in managing John's intravenous antibiotic treatment by not recognizing that John was suffering from a severe allergic reaction to the antibiotics, making contact with Dr. Oandasan, and, when IPH did not make contact with a physician, telephoning for emergency medical assistance to have John transported to a medical facility for acute assessment and treatment. He opines that with "early detection and response in this case, even as conducted, [John] would not have suffered the effects of antibiotic toxicity." Thus, Chitwood provided IPH a fair summary of his opinion as to how IPH's failure to act appropriately caused John's ultimate injuries.

The trial court could have reasonably concluded that Dr. Chitwood, in his report, made a "good faith effort" to provide a fair summary of the causal relationship between IPH's failure to meet the pertinent standard of care and John's injury. Accordingly, we hold that the trial court did not err in denying IPH's motion to dismiss the Ramseys' health care liability claim on the ground their expert report does not address causation.

We overrule IPH's sole issue.

## Conclusion

We affirm the order of the trial court.


Terry Jennings
Justice


Panel consists of Justice Jennings, Higley and Sharp.